MICHAEL J. GOODRICK, ESQ.
18 B Trolley Square
Wilmington, Delaware 19806
Delaware State Bar ID No. 170
(302) 778-5360

EPSTEIN & GILBERTI, LLC
21 East Front Street, Suite 210
Red Bank, New Jersey 07701
(732) 212-0400
Attorneys for petitioner Gerron Lindsey

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| **GERRON LINDSEY,** | : | Docket No. 05-164 |
| Petitioner. | : | |
| v. | : | |
| **STATE OF DELAWARE, ATTORNEY GENERAL, SUPERINTENDENT OF THE DEPARTMENT OF CORRECTIONS AND THE WARDEN DELAWARE CORRECTIONAL  CENTER,** | : | |
| Respondents. | : | |

**PETITION UNDER 18 U.S.C. § 2254
FOR A WRIT OF HABEAS CORPUS
BY PERSON IN STATE CUSTODY**

2005 MAR 18  AM 11: 17

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Petitioner Gerron Lindsey, by his attorneys, Michael V. Gilberti and Michel J. Goodrick, Esquire, petitions this Court under 28 U.S.C. § 2254 for a writ of habeas corpus by a person in state custody based upon the following:

1. Petitioner Gerron Lindsey is presently confined at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, Delaware 19977, and is in the custody of the Attorney General of the State of Delaware, the Superintendent of the Department of Corrections and the Warden of the Delaware Correctional Center.

2. On June 27, 2002, Hon. Haile L. Alford of the Superior Court of the State of Delaware, New Castle County, Delaware sentenced Mr. Lindsey and placed him "in the custody of the Department of Correction for the balance of his/her natural life at supervision level 5 –And –Or DE PSYCHIATRIC CENTER" as a result of his plea of "guilty, but mentally ill" on April 9, 2002 to one count of murder (first degree), arising out of the February 27, 2000 shooting of the husband and wife owners of a convenience store in Wilmington, Delaware. [Crim. ID. No. 0002019743]   Certified copies of the docket, the indictment and the sentencing order are attached to and made a part of this Petition as Exhibits A, B and C, respectively.

3. On or about September 19, 2002, Mr. Lindsey filed a *pro se* notice of appeal.  On or about January 7, 2003, the Supreme Court of Delaware (Justices Veasey, Berger and Steele) affirmed his conviction on his direct appeal. [Case No. 531, 2002] *See* Exhibit A.

(a)  On August 1, 2002, Mr. Lindsey filed his first *pro se* petition for post conviction relief.  On August 28, 2002, Judge Alford of the Superior Court of Delaware, New Castle County, denied it without an evidentiary hearing. *See* Exhibit A.

(b)  On December 9, 2003, Mr. Lindsey filed his second *pro se* petition for post conviction relief.  On February 6, 2004, Hon. Mary Miller Johnston of the Superior Court of

2

Delaware, New Castle County, denied it without an evidentiary hearing. On or about May 6, 2004, Mr. Lindsey filed a *pro se* notice of appeal. On June 7, 2004, the Supreme Court of Delaware (Justices Steele, Holland and Berger) affirmed. [Case No. 65, 2004] *See* Exhibit A.

4. At various times after his arrest and until his initial appeal, Mr. Lindsey received representation from four court-appointed attorneys: John S. Edinger, Esq. (assistant public defender), Anthony A. Figliola, Esq., Joseph A. Gabay, Esq. and Sheryl Rush-Milstead, Esq. *See* Exhibit A. Mr. Lindsey's counsel was ineffective because they ignored, failed to investigate and failed to use the following facts in defending him and instead pressured him to plead guilty:

(a) There were no eyewitnesses to the shooting. Counsel did not use this evidence adequately to defend the charges;

(b) The police never found a murder weapon or developed any other forensic evidence (such as a ballistics, fingerprints, DNA, blood or clothing), tying Mr. Lindsey to the shootings. Counsel did not conduct additional investigation or use this evidence adequately to defend the charges;

(c) The surviving victim, the only eyewitness, did not identify Mr. Lindsey as the shooter or pick him out of a police photo array. Counsel did not conduct additional investigation or use this evidence adequately to defend the charges;

(d) There were conflicting descriptions and identifications of a man scene in the area, and at least one witness, who heard the shot and saw a man running from the scene, identified another person. Counsel did not interview these witnesses, did not conduct additional investigation or use this evidence adequately to defend the charges;

3

(e)  The police and defense counsel were aware of another plausible suspect who had given a false alibi, and neither conducted much additional investigation or seriously pursued him as a suspect. Further, counsel did not use this evidence adequately to defend the charges;

(f)  Mr. Lindsey provided his counsel with the names of alibi witnesses. Counsel failed to interview these witnesses or conduct additional investigation of this area.

5.  Based upon the facts in the record, he is being held in violation of his Sixth Amendment rights because his attorneys provided constitutionally ineffective representation. Accordingly, this Court has jurisdiction to grant a writ of habeas corpus under 28 U.S.C. § 2241 *et seq.* Because this case arises out of a Delaware conviction and Mr. Lindsey is confined in the State of Delaware under the custody of the Attorney General of the State of Delaware, the Superintendent of the Department of Corrections and the Warden of the Delaware Correctional Center, venue lies in this federal district under 28 U.S.C. § 2241 *et seq.*

**A.  The Facts of the Case.**

6.  According to the police reports and based on the interview of Pavina Modi: sometime after noon on February 27, 2000, a single "black male" entered the Pine Street Market, 2241 North Pine Street, Wilmington, approached the front counter, asked for three cigars and a pack of cigarettes and, as the result of a dispute over price with Pravina Modi, the owner who was working the counter, shot her in the stomach. He then shot her husband Jayendra Modi, the other owner, in the chest, left and took nothing from the store. Copies of the reports are attached to and made a part of this Petition as Exhibit D.

7.  The police arrived at the scene at 1:10 p.m. and began their investigation. They found Ms. Modi with a gunshot wound in her abdomen and her husband with a gunshot wound in his chest. Mr. Modi died a short while later. *See* Exhibit D.

4

8. Later that day, the police interviewed Ms. Modi at the hospital. She provided the facts contained in paragraph 6 above. She also described the shooter as "early 20's, dark complexion, thin building, last seen wearing a black hat, and a dark jacket." *See* Exhibit D.

9. Two days later, the police showed Ms. Modi a photo array, containing Mr. Lindsey's picture, and she could not identify the shooter. *See* Exhibit D.

10. Also on the afternoon of February 27, 2000 the police spoke with a number of witnesses.

11. They interviewed Kathy Dunn (age 36). She had been in the store with her children just before the shooting to buy luncheon meat and told them that:

(a) a man had "flirted with her" at first and then "asked her if she had purchased anything that she wanted because he was going to rob the store";

(b) she completed her purchase and left;

(c) the man was "a black male in his 20's, dark complexion, some facial hair, approximately 6"02", thin build with clean white teeth . . . last seen wearing a black wool hat, black flight jacket, black pants and dark colored shoes." *See* Exhibit D.

12. Significantly, she did not see the shooting or did not hear the shot.

13. Two days later, she went to the police station, viewed a line up and identified Mr. Lindsey as the person she had seen in the store before the shooting. *See* Exhibit D.

14. Also on February 27, 2000, the police interviewed a Ms. Dunn's 12-year old niece, Nakeia Devine. She was in the store to buy a soda and saw her aunt and a "black male [who] appeared to be 17 or 18 years old and was last seen wearing a black hat, black flight jacket and black pants." She could not identify that man from the photo array. *See* Exhibit D.

5

15. The police also interviewed Cheri Coverdale (age 29). She had just left the store before the shooting and she told them that she had seen a man known to her as "'Black' pacing in front of the door." She said "he looked like he was up to no good." She then walked to a relative's home several blocks away. She described "'Black' as being approximately 17 to 20 years old, tall dark complexion, thin build, last seen wearing a black hat, black jacket and black pants." She said he was "a friend of her son's." The next day, the police returned with the photo array, and she could not identify "the suspect known to her as 'Black.'" *See* Exhibit D.

16. The police also spoke with Archie Monroe (age 42) later that day. He said that:

(a) he was in the area to visit a friend, but his friend was not home so he headed to the store to buy a newspaper;

(b) just outside the store, he ran into a friend, named Patrick Everett, and had a brief conversation;

(c) Mr. Everett entered the store to buy something, while he went back across the street to see if his friend had returned;

(d) he then saw Mr. Everett running away from the store, and Mr. Everett yelled to him, "That guy is robbing the store";

(e) he then heard a gunshot and saw "a black male subject exiting the store" and running away. He described the man "as being a black male 6'03", medium build, dark complexion, facial hair, last seen wearing a black or blue hat, dark sweat shirt, dark pants with a white t-shirt hanging outside of his pants." *See* Exhibit D.

17. The following afternoon, the police showed him the photo array, but he was unable to identify the man he saw running from the store. Two days later, he viewed a live lineup,

6

including Mr. Lindsey, chose a different man as the man he saw running from the store.  Mr. Everett picked out Mr. Lindsey as the man he saw.  *See* Exhibit D.

18.  The police also interviewed Keevan Hale (age 21) later on the day of the incident. He said that:

(a) at about noon that day, he had been in the store, and while he was leaving, he saw "a subject known to him by the nickname of 'Black' walking across Pine Street towards the store";

(b) "'Black' said "What's up!" to him," and he then went home;

(c) "Black was wearing a black wool hat, black flight jacket, and dark jeans."  *See* Exhibit D.

19.  After that, the police tried to identify the person whom the witnesses knew as "Black."  From the descriptions and other information, they viewed Mr. Lindsey as a suspect.

20.  Two days after the shooting, the police obtained and executed a day-time search warrant at Mr. Lindsey's house and then found him down at another residence.  They did not find the gun or any of clothing that matched the witnesses' descriptions.  *See* Exhibit D.

21.  At that time, the police also interviewed him and his friend, Roseanna Warner.

22.  After receiving his ***Miranda*** rights, Mr. Lindsey denied shooting the Modis.  He also told the police that:

(a) he and "'Ed Lover' [Ed Rogers] planned to rob the Pine Street Market located at 2241 N. Pine Street";

(b) Mr. Rogers had "entered the store first and stayed inside for a long time";

(c) after Mr. Rogers had "left the store he went inside and observed that the clerks had been shot";

(d) he "then stepped over the bodies to look for something";

(e) "he grabbed a box of cigars and then fled from the store on foot." *See* Exhibit D.

23. Ms. Warner told the police that:

(a) on February 27, Mr. Lindsey had "stayed home and watched her three year old son while she went to the laundromat to wash clothes";

(b) "when she and her sister . . . returned from washing clothes Gerron was still inside the house with her son";

(c) "he later asked for a ride to the area of the 2400 block of Locust Street where she dropped him off";

(d) "between the time she dropped him off and the time she returned home he called her on the telephone to come back and to pick him up";

(e) "upon picking him up they returned home where he stayed inside the house until the next morning." *See* Exhibit D.

24. The police never found the gun used in the shootings.

25. The police never conducted any scientific tests or analysis on any of Mr. Lindsey's clothing to determine the presence of blood or gunpowder. And no scientific or forensic evidence, such as ballistics, blood or DNA tests, connected Mr. Lindsey to the shooting.

**B. Another Plausible Suspect and His False Alibi.**

26. On April 10, 2000, the police found Ed Rogers a/k/a "Ed Lover" in the 2400 block of North Market Street. He went with the officers to the police station and gave a statement. He denied that he knew Mr. Lindsey and, when shown a photo array containing Mr. Lindsey's, he said he did not recognize anyone in the pictures. *See* Exhibit D.

27. He also told the officers that:

(a) he worked every weekend at John Harvard's Brew House; and

8

(b) on February 27, 2000, he had been at work there. *See* Exhibit D.

28. On April 18, 2000, a police officer served a subpoena on the manager of John Harvard's Brew House and, on April 20, 2000, obtained Rogers' work history and employment application. *See* Exhibit D.

29. Mr. Rogers' time cards confirmed that he was employed at the Brew House during February 2000, but contradicted his claim that he had been working there on Sunday, February 27, 2000 – the date of the incident. *See* Exhibit D.

30. After that, the police made several unsuccessful attempts to locate Rogers at various known addresses, and later closed their investigation of him. *See* Exhibit D.

### C. The Procedural History of the Case.

31. On February 29, 2000, the police arrested Mr. Lindsey and charged him with the shootings. He was held without bail. Initially, the court-appointed assistant public defender John S. Edinger, Jr., Esq. to represent him. *See* Exhibit A.

32. On March 7, 2000, Judge Jay Paul Williams, Court of Common Please, New Castle County, Delaware, conducted a preliminary hearing in which Detective Andrew Brock testified, summarized the evidence, charged that Mr. Lindsey had robbed the store and shot the owners. The detective based this testimony based substantially on the statement of Kathy Dunn and her purported identification of Mr. Lindsey at the store before the shooting. The court found probable cause. *See* Exhibit A.

33. On March 22, 2000, Mr. Edinger requested discovery, and on June 14, 2000, the State responded and produced various items, including a videotape of Mr. Lindsey's exculpatory post-arrest statement. *See* Exhibit A.

9

34. On or about April 10, 2000, a grand jury in Wilmington returned a twelve-count indictment against Mr. Lindsey, charging him with first degree murder, felony murder, attempted murder, two counts of first degree robbery, two counts of possession of a deadly weapon by a prohibited person and 5 counts of possession of a handgun in the commission of a felony. *See* Exhibit B. The case was assigned to Judge Haile L. Alford.

35. At his arraignment on May 2, 2000, Mr. Lindsey pled not guilty. *See* Exhibit A.

36. On September 28, 2000, a grand jury returned a superseding indictment, containing the same charges, but correcting various items. The State also sought the death penalty. *See* Exhibit A.

37. At a status conference on October 16, 2000, Mr. Edinger moved to be relieved because of a conflict of interest (based upon unspecified information received from another client), and on October 20, 2000, the court entered an order relieving him. The court then appointed Anthony A. Figliola, Esq. The court also appointed Joseph Gabay, Esq. as co-counsel to handle the death penalty mitigation case for Mr. Lindsey. *See* Exhibit A.

38. Originally, the case was set to begin trial in January 2001, but when the State superseded the indictment and sought the death penalty, the court issued a new pretrial and trial schedule, setting the trial for November 2001. *See* Exhibit A.

39. At some point during these events, Mr. Lindsey provided his counsel a list of witnesses who could verify that he was not in the store at the time of the shooing. There is no evidence that his counsel contacted these people or conducted any investigation relating to them.

40. On August 30, 2001, the court entered an order, approving payment to Security Services International to assist defense counsel in investigating the case. *See* Exhibit A.

41. In September 2001, Mr. Gabay had physical problems, and as a result, the court also appointed Sheryl Rush Milstead, Esq. to replace him as co-counsel for the mitigation case. *See* Exhibit A.

42. On or about October 29, 2001, defense counsel moved for a continuance because Ms. Milstead was unavailable for the November 2001 trial. In the motion, counsel noted that "[o]n . . . or about October 18, 2001, counsel received a letter from defendant requesting in part that new counsel be appointed, [*sic*] Mr. Lindsey was not satisfied that [his lawyers] were acting in his best interest by recommending a plea." A copy of the motion is attached to and made a part of this petition as Exhibit E (¶ 12).

43. On November 1, 2001, the court granted the continuance, but denied his request for new counsel. Subsequently, the court entered an order, scheduling jury selection for April 2, 2002 and the trial for April 10, 2002. *See* Exhibit A.

44. In or about January 2002, defense counsel concluded that Mr. Lindsey may possibly have "organic" mental problems. A copy of this motion is attached to and made a part of this Petition as Exhibit F (¶ 3).

45. On or about February 20, 2002, Mr. Lindsey sent a letter to the court, requesting that someone "tell him what's going on in his case" and inquiring about bail. *See* Exhibit A.

46. On March 1, 2002, the court held an office conference and, at the request of defense counsel, approved $2,500 for Dr. Alvin Turner to conduct a psychological evaluation of Mr. Lindsey "as soon as possible" and to report his findings to the court on or before April 12, 2002.

47. On March 28, 2002, the State transferred Mr. Lindsey to Delaware State Hospital. *See* Exhibit A.

Case 1:05-cv-00164-SLR    Document 1    Filed 03/18/2005    Page 12 of 17

48. On April 9, 2002, during jury selection for his trial, Mr. Lindsey agreed to plead "guilty, but mentally ill" to count 1 of the indictment, first degree murder. In exchange, the prosecution agreed "to not seek the death penalty" and to dismiss the remaining counts of the indictment. A copy of the plea agreement is attached to and made a part of this petition as Exhibit G. Based upon conversations with his counsel and his transfer to the state hospital, he expected that he would serve his sentence at the state hospital.

49. Later on April 9, 2002, Mr. Lindsey sent a handwritten letter to the court, stating:

> I have come down off my medication and I realized I have signed a plea to life imprisonment and that's not what I wanted to do. My medication I take for sleep problems have me dozing off and I just gave any answers to get this over. But I am asking that you withdraw the plea. And my records show I take medication.

A copy of that letter is attached to and made a part of this petition as Exhibit H.

50. On or about April 29, 2002, Sylvia Foster, M.D. and Christa McDaniel, Ph.D. filed a psychiatric-psychological report with the court.

51. On or about May 6, 2002, Mr. Lindsey's counsel followed up on the letter and filed a formal motion to withdraw his plea, asserting that: (a) at the time the plea was entered, he "was a patient at the Delaware State Hospital"; (b) he was "receiving medication which effected [*sic*] his ability to understand what he was doing"; and (c) "[a]s a result of the medication, Defendant was unable to appreciate his act." A copy of the motion is attached to and made a part of this petition as Exhibit I.

52. That same day, both defense lawyers moved to withdraw as counsel. *See* Exhibit A.

53. On May 21, 2002, the trial judge denied both motions. *See* Exhibit A.

54. On June 27, 2002, the court held an evidentiary hearing at which Dr. Foster testified and determined that Mr. Lindsey was mentally ill during the offense, and sustained the "guilty,

but mentally ill" plea.  The court than sentenced him to life imprisonment without parole.  *See* Exhibit A.

55.  In August 2002, Mr. Lindsey moved in Delaware Superior Court for state post-conviction relief, again arguing that: (a) his medication had affected his decision to plead guilty; and (b) his attorneys misled him by advising him that he would serve his sentence in the state hospital instead of prison.  A copy of that petition is attached to and made a part of this petition as Exhibit J.

56.  The Superior Court denied the motion, and in an order, dated January 7, 2003, the Delaware Supreme Court affirmed that decision.  *See* Exhibit A.

57.  On December 9, 2003, he filed a second motion for post-conviction relief under Criminal Rule 61 in the Superior Court, arguing ineffective assistance of counsel.  *See* Exhibit A.

58.  On February 6, 2004, the court denied that motion, and subsequently, the Delaware Supreme Court affirmed that denial.  *See* Exhibit A.

59.  In his post-conviction motions, he has argued that his counsel was constitutionally ineffective, and denied him of his right to a fair trial and undermined the "fundamental legality, reliability, integrity or fairness of the proceedings" leading to his conviction because:

(a) his counsel had the evidence concerning another suspect's  (Ed Rogers' false alibi), and they knowingly failed to conduct further investigation of that evidence or to use it to defend and possibly exonerate him;

(b) his counsel were aware that a critical witness had identified another person as the shooter in a lineup and they failed to conduct further investigation of that evidence or to use it to defendant and possibly exonerate him;

13

(c) his counsel did not interview the surviving victim so that they could assess the credibility of his story;

(d) his counsel did not interview witnesses named in the state's discovery who would have placed him across the street at the time of the shooting; and

(e) his counsel failed to interview witnesses or otherwise investigate the supplement police report that contained conflicting "statements by many different witnesses," including the failure of one witness to pick him out of a photo array (despite his comments about the suspect being "up to no good" and his identification of the suspect as the person known as "Black") and the identification of another person as the suspect by another witness.

60. In response, the State has argued that:

(a) the Superior Court has rejected his claims that his plea was involuntary because he was taking prescription medication or that it the medication in any way affected his ability to understand the proceedings;

(b) he waived any claim that her counsel was ineffective "because they did not pursue the possibility that another individual committed the store robbery";

(c) in any event, his "account [of the events] . . . was totally refuted by the surviving shooting victim (who also identified Lindsey as the assailant) and two individuals who saw (and talked to) Lindsey in the store as they were making purchases immediately **before** the robbery" and her "letter to the trial judge in which [he] admitted shooting the victims." (Emphasis added)

**D. Mr. Lindsey is Entitled to a Writ of Habeas Corpus.**

61. As is evident from the police reports, there was exculpatory evidence, and there holes and inconsistencies in the State's case, including:

14

(a) the only eyewitness to the shootings, Ms. Modi, did not identify Mr. Lindsey as the shooter;

(b) there was another plausible suspect (Mr. Rogers) who gave the police a false alibi;

(c) equivocal identifications from different witnesses to the events preceding the incident, and one witness who reported seeing another man (not Mr. Lindsey) fleeing the scene after he heard the shot, picked another man out of the lineup;

(d) the police did not find the murder weapon or develop any other physical, forensic or scientific evidence to tie Mr. Lindsey to the shooting.

62.  Moreover, he provided his counsel a list of possible alibi witnesses.

63.  His counsel did not conduct any investigation or use the absence of evidence and conflicting evidence to properly advise and defend Mr. Lindsey.  Instead, they pressured him to plead guilty.  By permitting him to plead guilty in light of the lack of evidence and inconsistencies in the case, counsel was also ineffective.

64.  If counsel had adequately and competently performed, Mr. Lindsey would have been able to defend his case and defeat the indictment, and the result would have been different.

65.  As a result, he is being held in violation of his Constitutional rights; there has been a miscarriage of justice; and he was prejudiced.

66.  On two separate occasions, in October 2001 and February 2002, Mr. Lindsey made complaints directly or indirectly to the trial court about the lack of effectiveness of his attorneys, and in both instances, the trial court ignored or rejected his complaints.

67.  Mr. Lindsey has directly appealed his conviction through the Delaware state court system and he has brought, and appealed the results of, two post conviction actions in and

15

through the Delaware state courts.  As a result, he has exhausted his state court remedies, leaving

only an application to the federal courts.

68.  By failing to grant Mr. Lindsey relief, the Delaware courts have made findings of

fact and conclusions of law that are objectively unreasonable.

WHEREFORE, petitioner Gerron Lindsey respectfully requests this Court grant him a

writ of habeas corpus and such other relief as the Court deems appropriate.

Respectfully submitted,

MICHAEL J. GOODRICK

MICHAEL V. GILBERTI

Dated: February 23, 2005

16

**VERIFICATION**

I hereby declare under penalty of perjury that the facts stated in the foregoing motion and memorandum of law are true to the best of his knowledge and belief.

Executed on: _____2.22.05_____

GERRON V. LINDSEY