MICHAEL J. GOODRICK, ESQ.
18 B Trolley Square
Wilmington, Delaware 19806
Delaware State Bar ID No. 170
(302) 778-5360

EPSTEIN & GILBERTI, LLC
21 East Front Street, Suite 210
Red Bank, New Jersey 07701
(732) 212-0400
Attorneys for petitioner Gerron Lindsey

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **GERRON LINDSEY,** | : | Docket No.  05-164 |
| Petitioner. | : | |
| v. | : | |
| **STATE OF DELAWARE, ATTORNEY GENERAL, SUPERINTENDENT OF THE DEPARTMENT OF CORRECTIONS AND THE WARDEN DELAWARE CORRECTIONAL  CENTER,** | : | |
| Respondents. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF PETITION UNDER 18 U.S.C. § 2254 FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ i

STATEMENT OF FACTS ........................................................................3

    A. The Underlying Events and Police Investigation............................3

    B. Another Plausible Suspect and His False Alibi..............................6

    C. The Procedural History of the Case. ...............................................6

LEGAL ARGUMENT...........................................................................11

I.      MR. LINDSEY WAS DENIED EFFECTIVE
        ASSISTANCE OF COUNSEL BECAUSE HIS
        COUNSEL DID NOT INVESTIGATE
        EXCULPATORY EVIDENCE AND HOLES
        AND INCONSISTENCIES IN THE STATE'S CASE THAT
        WOULD HAVE EXONERATED HIM OF THE CHARGES .....11

    A. The Applicable Legal Standard for a Writ of
       Habeus Corpus. .........................................................................11

    B. The Applicable Legal Standard for Ineffective
       Assistance of Counsel .................................................................13

    C. Mr. Lindsey Received Ineffective Legal Assistance.....................16

CONCLUSION.......................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Anders v. California*, 386 U.S. 738 (1967) ................................................14

*Berryman v. Morton*, 100 F.3d 1089 (3d Cir. 1996),................................15

*Hardcastle v. Horn*, 348 F.3d 246
   (3d Cir. 2004).  Section 2241 ...............................................11,13

*Hill v. Lockhart*, 474 U.S. 52 (1985) .........................................14

*Hoots v. Allsbrook*, 785 F.2d 1214 (4th Cir. 1986)....................................15

*Lockyear  v. Andrade*,      U.S.    , 123 S. Ct.
   1166 (2003)........................................................13

*Stevens v. Delaware Correctional Center*,
   295 F.3d 361 (3d Cir. 2002).  ..............................................12,15

*Sanders v. Ratelle*, 21 F.3d 1446 (9th Cir. 1994)......................................15

*Strickland v. Washington*, 466 U.S. 668 (1984)..................................14,16

*United States  v. Cronic*, 466 U.S. at 654,
   *citing United States v. Ash*, 413 U.S. 300 (1973)....................................14

*United States v. Brown*, 991 F.2d 1162 (3d Cir. 1993)............................14

*United States v. Gray*, 878 F.2d 702 (3d Cir. 1989)................................15

*Werts v. Vaughn*, 228 F.3d 178
   (3d Cir. 2000); *Hardcastle, supra*............................................13

*Williams v. Taylor*, 529 U.S. 362 (2000) .......................................12, 13,14

28 U.S.C. § 2241 ...........................................................11

28 U.S.C. § 2254(a) .......................................................11

28 U.S.C. § 2254(b) .......................................................12

28 U.S.C. § 2254(c). ...................................................................................12

28 U.S.C. § 2254(d). ...................................................................................12

Antiterrorism and Effective Death Penalty Act of 1996...........................11

### PRELIMINARY STATEMENT

Upon advice of his court-appointed attorneys, Gerron Lindsey pled "guilty, but mentally ill" to the shooting murder of a convenience storeowner in Wilmington, Delaware. This petition seeks a writ of habeas corpus and presents Mr. Lindsey's claim that he is being held in respondents' custody in violation of his rights under the Sixth Amendment to the United States Constitution. His counsel committed fundamental errors and omissions by not investigating critical exculpatory evidence, not exploiting the substantial holes in the State's case and not adequately preparing his defense. If they had, the advice they gave to Mr. Lindsey would have been radically different, and Mr. Lindsey would not have pled guilty and could have defeated the charges.

Initially, the State never found the gun used in the shooting and never developed any other physical, forensic or scientific evidence to connect Mr. Lindsey to the shooting. There was also no eyewitness, identifying him as the shooter or even placing him at the scene at the time of the shooting. The only eyewitness, the surviving wife of the murdered storeowner, did not describe him or pick his picture out of a photo array. The remaining witnesses to the events preceding the incident gave differing descriptions and one even identified a different person as the shooter in a lineup. There were also numerous alibi witnesses that Mr. Lindsey identified for his counsel.

Finally, the police developed evidence that another man, Ed Rogers, may have done the shooting. Mr. Rogers told the police that he was working at a local bar at that time. But his time cards from the bar showed that he was not there when the shooting occurred. Instead of pursuing him as a suspect, the police simply closed their investigation of him.

Despite these compelling facts, Mr. Lindsey's counsel did nothing to investigate this exculpatory evidence and these holes and did not adequately use them to defend him. Rather, they pushed Mr. Lindsey to plead guilty.

Consequently, they prevented him from defending a defensible case, and their representation fell far below the minimal standard of competency. Moreover, even after Mr. Lindsey complained directly to the trial court, it did nothing to help him. And in rejecting Mr. Lindsey's claim on his direct appeal and on his two post-conviction petitions, the Delaware courts factual and legal determinations were objectively unreasonable.

As a result, this Court should grant him a writ of habeas corpus.

## STATEMENT OF FACTS

### A. The Underlying Events and Police Investigation. [1]

According to the police reports and based upon the interview with Pravina Modi: sometime after noon on February 27, 2000, a single "black male" entered the Pine Street Market in Wilmington, approached the front counter, asked for three cigars and a pack of Newport cigarettes and, after a dispute over price with Ms. Modi, the owner who was working the counter, shot her in the stomach. He then shot her husband Jayendra Modi, the other owner, in the chest, left and took nothing from the store.

No one else saw the shooting. The police never found the murder weapon and never developed any physical, forensic or scientific evidence, such as ballistics tests, fingerprints, DNA or bloody clothing linking Mr. Lindsey to the crime.

The police arrived at the scene at 1:10 p.m. and began their investigation. They found Ms. Modi with a gunshot wound in her abdomen and her husband with a gunshot wound in his chest. Mr. Modi died. Later that day, they interviewed Ms. Modi at the hospital. She described the shooter as "early 20's, dark complexion, thin build, last seen wearing a black hat, and a dark jacket." Two days later, the police showed her a photo array, containing Mr. Lindsey's picture, and she could not identify the shooter.

The police also interviewed a number of other witnesses on the day of the incident. First, they spoke with Kathy Dunn (age 36), who had been in the store to buy luncheon meat. She said a man had "flirted with her" at first and then "asked her if she had purchased anything that she wanted because he was going to rob the store." At that time, she made her purchase and left before anything happened. Significantly, she did not see the shooting or make any statement that she heard the shot.

---

[1] All of the facts contained in this section come from the report of the police investigation attached to the Petition as Exhibit D.

She described the man she saw in the store before the shooting as "a black male in his 20's, dark complexion, some facial hair, approximately 6'02", thin build with clean white teeth . . . last seen wearing a black wool hat, black flight jacket, black pants and dark colored shoes." Two days later, she viewed a police line up and identified Mr. Lindsey as that man.

The police also spoke with her 12-year old niece, Nakeia Devine. She went to the store to buy a soda and saw her aunt and a "black male [who] appeared to be 17 or 18 years old and was last seen wearing a black hat, black flight jacket and black pants." She could not identify anyone in the photo array.

The police also spoke with Cheri Coverdale (age 29), who left the store just before the incident. She had seen a man she knew as "'Black' pacing in front of the door." She said "he looked like he was up to no good." She then went to a relative's home several blocks away. She described "'Black' as being approximately 17 to 20 years old, tall dark complexion, thin build, last seen wearing a black hat, black jacket and black pants," and said he was "a friend of her son's." But when the police showed her the photo array the next day, "she did not see the suspect known to her as 'Black.'"

The police also interviewed Archie Monroe (age 42). He was in the area to visit a friend, but his friend was not home so he went to the store for a newspaper. Just outside, he met another friend, Patrick Everett. They spoke briefly, and Mr. Everett went into the store. Just after he went back across the street to see if his friend had returned, Mr. Monroe saw Mr. Everett running away from the store and heard him say, "That guy is robbing the store." He heard a gunshot and then saw "a black male subject exiting the store" and running away. He described the man "as being a black male 6'03", medium build, dark complexion, facial hair, last seen wearing a black or blue hat, dark sweat shirt, dark pants with a white t-shirt hanging outside of his pants."

When the police showed him the photo array the next afternoon, he was unable to identify the man he saw running. Mr. Monroe and Mr. Everett attended the police lineup, including Mr. Lindsey, on February 29, 2000. Mr. Monroe picked another man as the man he saw running from the store, and Mr. Everett picked out Mr. Lindsey.

The police also spoke with Keevan Hale (age 21) later on the day of the incident. At about noon that day, he was at the store, and as he was leaving, he saw a man he knew "by the nickname of 'Black' walking across Pine Street towards the store." "'Black' said 'What's up!' to him." He then headed home. "Black was wearing a black wool hat, black flight jacket, and dark jeans."

After that, the police continued their attempts to identify the person identified as "Black." At some point, they focused on Mr. Lindsey as a suspect. On the morning of February 29, 2000, the police obtained and executed a day-time search warrant for his house and found him at the home of his friend, Roseanna Warner. The police conducted searches and interviewed him and Ms. Warner. None of the searches unearthed the gun or any of the clothing that the witnesses had identified.

After receiving his *Miranda* rights, Mr. Lindsey denied shooting the Modis. He told the police that he and "'Ed Lover' [Ed Rogers] planned to rob the Pine Street Market located at 2241 N. Pine Street." Mr. Rogers had "entered the store first and stayed inside for a long time." After Mr. Rogers left the store, Mr. Lindsey went inside and saw that "the clerks had been shot." He then "grabbed a box of cigars and then fled from the store on foot."

Ms. Warner told the police that, on February 27, Mr. Lindsey had "stayed home and watched her three year old son while she went to the laundromat to wash clothes." Later, he asked her "for a ride to the area of the 2400 block of Locust Street where she dropped him off." Sometime after she dropped him off but before she got home, "he called her on the telephone to

come back and to pick him up." She picked him up and "they returned home where he stayed inside the house until the next morning."

### B. Another Plausible Suspect and His False Alibi. [2]

Nearly a month and a half after the shooting – on April 10, 2000, the police finally located Ed Rogers a/k/a "Ed Lover" in the 2400 block of North Market Street. He went with them to the police station and gave a statement. He denied knowing Mr. Lindsey and, when shown the photo array containing Mr. Lindsey's picture, he did not recognize anyone.

He also provided the officers an alibi. He said that, during February 2000, he worked every weekend at John Harvard's Brew House in Wilmington and, on Sunday, February 27, 2000 – the day of the shooting, he was at work there.

On April 18, 2000, a police officer subpoenaed his time records from John Harvard's, and on April 20, 2000, they received Mr. Rogers' work history and employment application. While the documents confirmed that he had worked there during February, they refuted his claim that he was at work at the time of the shooting. Nonetheless, after several unsuccessful attempts to locate him at various known addresses, the police closed their investigation of him.

### C. The Procedural History of the Case. [3]

On February 29, 2000, the police arrested Mr. Lindsey and charged him with the shootings. He was held without bail. Initially, the court-appointed assistant public defender John S. Edinger, Jr., to represent him.

On March 7, 2000, Judge Jay Paul Williams of the Common Please Court of Delaware, New Castle County, conducted a preliminary hearing at which Detective Andrew Brock testified,

---

[2] All of the facts contained in this section come from the report of the police investigation attached to the Petition as Exhibit D.

[3] Except as otherwise noted, most, if not all, of the information in this section comes from the docket entries, which are attached to the Petition as Exhibit A.

summarized the evidence and charged that Mr. Lindsey had robbed the store and shot the owners. The detective based his testimony substantially on his investigation, especially the statement of Kathy Dunn and her purported identification of Mr. Lindsey at the store before the shooting. The court found probable cause and held Mr. Lindsey on the charges.

In due course, Mr. Edinger requested discovery and received discovery, including a videotape of Mr. Lindsey's post-arrest statement that identified Mr. Rogers as the shooter.

On April 10, 2000, a grand jury in Wilmington returned a twelve-count indictment against Mr. Lindsey, charging him with first degree murder, felony murder, attempted murder, two counts of first degree robbery, two counts of possession of a deadly weapon by a prohibited person and 5 counts of possession of a handgun in the commission of a felony. [Exhibit B] The case was assigned to Judge Haile L. Alford. At the arraignment on May 2, 2000, Mr. Lindsey pled not guilty.

On September 28, 2000, a grand jury returned a superseding indictment, containing the same charges, but correcting various items. The State also sought the death penalty.

At a status conference on October 16, 2000, Mr. Edinger moved to be relieved because of a conflict of interest (resulting from information received from another client), and on October 20, 2000, the court relieved him on the condition that he not represent either client. The court then appointed Anthony A. Figliola, Esq. The court also appointed Joseph Gabay, Esq. as co-counsel to handle Mr. Lindsey's death penalty mitigation case. Originally, the court scheduled a trial for January 2001, but when the State superseded the indictment and sought the death penalty, the court issued a new pretrial and trial schedule, setting the trial for November 2001.

During this time, Mr. Lindsey provided his attorneys with a list of witnesses who could corroborate his statement that he was not in the store, but was across the street, at the time of the shooting. On August 30, 2001, the court entered an order, approving payment to Security

Services International ("SSI") to assist defense counsel in investigating the case. According to the application, SSI did not interview any of the witnesses, attempt to investigate Mr. Rogers or probe the holes in the prosecution's case.

In September 2001, Mr. Gabay had physical problems, and as a result, the court also replaced him and appointed Sheryl Rush Milstead, Esq. as co-counsel in charge of the mitigation case. On October 29, 2001, defense counsel moved for a continuance because Ms. Milstead was unavailable for the November 2001 trial. In that motion, counsel noted that on "October 18, 2001, counsel received a letter from defendant requesting in part that new counsel be appointed, [*sic*] Mr. Lindsey was not satisfied that [his lawyers] were acting in his best interest by recommending a plea." [Exhibit E, ¶ 12] Accordingly, at this early date, the court was aware that he had grave concerns about that his counsel was not adequately representing him and was pressuring him into pleading guilty. On November 1, 2001, the court granted the continuance, but denied his request for new counsel. The court also entered an order, scheduling jury selection for April 2, 2002 and the trial for April 10, 2002.

In January 2002, defense counsel developed a belief that Mr. Lindsey may have "organic" mental problems. [Exhibit F, ¶ 3] On February 20, 2002, Mr. Lindsey sent a letter to the court, requesting that someone "tell him what's going on in his case" and inquiring about bail. For a second time, Mr. Lindsey told the court he was concerned about his lawyers' lack of contact with him and their apparent inattention to his capital case.

On March 1, 2002, the court held an office conference and, at the request of defense counsel, approved $2,500 for Dr. Alvin Turner to conduct a psychological evaluation of Mr. Lindsey "as soon as possible" and to report his findings to the court on or before April 12, 2002.

On March 28, 2002, the State transferred Mr. Lindsey to Delaware State Hospital for his evaluation.

On April 9, 2002, during jury selection for his trial and at counsel's urging, Mr. Lindsey agreed to plead "guilty, but mentally ill" to count 1 of the indictment, first degree murder. In exchange, the prosecution agreed "to not seek the death penalty" and to dismiss the remaining counts of the indictment.  [Exhibit G]  From his conversations with counsel, Mr. Lindsey reasonably expected that he would serve his sentence in the state hospital.

Later that same day, Mr. Lindsey sent a handwritten letter to the court, stating:

> I have come down off my medication and I realized I have signed a plea to life imprisonment and that's not what I wanted to do.  My medication I take for sleep problems have me dozing off and I just gave any answers to get this over.  But I am asking that you withdraw the plea.  And my records show I take medication.

[Exhibit H]

A week later, Mr. Lindsey's counsel followed up the letter with a formal motion to withdraw his plea, asserting that: (a) at the time the plea was entered, he "was a patient at the Delaware State Hospital"; (b) he was "receiving medication which effected [*sic*] his ability to understand what he was doing"; and (c) "[a]s a result of the medication, Defendant was unable to appreciate his act."  [Exhibit I]

That same day, both defense lawyers moved to withdraw as counsel, claiming that withdrawal of the plea was not in Mr. Lindsey's best interest. On May 21, 2002, the trial judge denied both motions.

On April 29, 2002, Sylvia Foster, M.D. and Christa McDaniel, Ph.D. filed a psychiatric-psychological report with the court. And on June 27, 2002, the court held an evidentiary hearing at which Dr. Foster testified and determined that Mr. Lindsey was mentally ill during the offense, and sustained the "guilty, but mentally ill" plea. The court then placed him "in the custody of the Department of Correction for the balance of his/her natural life at supervision level 5," a much more severe sentence than his counsel had led him to believe he would receive. [Exhibit C]

In August 2002 and again on November 28, 2003, Mr. Lindsey moved in Delaware Superior Court for state post-conviction relief, again arguing that: (a) his medication had affected his decision to plead guilty; and (b) his attorneys misled him by advising him that he would serve his sentence in the state hospital instead of prison. [Exhibit J]

On September 19, 2002, Mr. Lindsey filed a *pro se* notice of appeal. And on January 7, 2003, the Supreme Court of Delaware affirmed his conviction on his direct appeal. [*See* Exhibit A]

On August 1, 2002, Mr. Lindsey filed his first *pro se* petition for post conviction relief. On August 28, 2002, Judge Alford denied it without an evidentiary hearing. [*See* Exhibit A]

On December 9, 2003, Mr. Lindsey filed his second *pro se* petition for post conviction relief. On February 6, 2004, Judge Mary Miller Johnston of the Superior Court of Delaware, New Castle County, denied it without an evidentiary hearing. On May 6, 2004, Mr. Lindsey filed a *pro se* notice of appeal. On June 7, 2004, the Supreme Court of Delaware affirmed the trial court's denial of post-conviction relief. [*See* Exhibit A]

In his post-conviction motions, he argued that his counsel was constitutionally ineffective, denied him of his right to a fair trial and undermined the "fundamental legality, reliability, integrity or fairness of the proceedings" leading to his conviction. However, the Delaware courts rejected those claims, both on direct appeal and on collateral review.

Because he has exhausted his state remedies and is being held in violation of his Sixth Amendment rights to effective assistance of counsel, Mr. Lindsey has filed this petition.

**LEGAL ARGUMENT**

**I.   MR. LINDSEY WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE HIS COUNSEL DID NOT INVESTIGATE EXCULPATORY EVIDENCE AND HOLES AND INCONSISTENCIES IN THE STATE'S CASE THAT WOULD HAVE EXONERATED HIM OF THE CHARGES.**

Mr. Lindsey defense counsel committed fundamental errors and omissions so egregious that they violated his right to effective assistance of counsel by not investigating exculpatory evidence and properly preparing his defense. Instead they pressed him to plead guilty. If they had performed competently, Mr. Lindsey would not have pled guilty, the result most probably would have been different, and he would have been acquitted. Moreover, the Delaware courts wrongly denied him post-conviction relief. As a result, Mr. Lindsey has petitioned this Court for a writ of habeas corpus.

**A.   The Applicable Legal Standard for a Writ of Habeas Corpus.**

Mr. Lindsey's petition is predicated upon the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2241 *et seq. See **Hardcastle v. Horn**,* 348 F.3d 246 (3d Cir. 2004). Section 2241 provides:

(a) Writs of habeas corpus may be granted by . . . the district courts within their respective jurisdictions . . .

\*        \*        \*

(c) The writ of habeas corpus shall not extend to a prisoner unless –

\*        \*        \*

(3) He is in custody in violation of the Constitution or laws or treaties of the United States . . . .

In addition, 28 U.S.C. § 2254(a) provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or

11

treaties of the United States." However, an application for a writ "shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner." 28 U.S.C. § 2254(b). A petitioner fails to satisfy the exhaustion requirement "if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

Finally, once it appears that a petitioner has exhausted his state remedies – as Mr. Lindsey has done here, the findings of the state court "shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit – . . .

> (2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;
>
> (3) that the material facts were not adequately developed at the State court hearing;
>
> \*       \*       \*
>
> (5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;
>
> (6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or
>
> (7) that the applicant was otherwise denied due process of law in the State court proceeding;
>
> (8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record . . . ."

28 U.S.C. § 2254(d).

The AEDPA sets forth the standard of review a federal district court must apply to a state prisoner's claim that the state court adjudicated on the merits. ***Williams v. Taylor***, 529 U.S. 362,

402-413 (2000); *Stevens v. Delaware Correctional Center*, 295 F.3d 361, 368 (3d Cir. 2002).

The federal court "must presume that the **factual findings** of both state trial and appellate courts

are correct, a presumption that can only be overcome on the basis of clear and convincing

evidence to the contrary." (Emphasis added) *Id.*; *Stevens*, 295 F.3d at 368. Further, "[w]hen a

federal court reviews a state court's findings of fact, its decision must stand unless 'it was based

on an unreasonable determination of the facts in light of the evidence presented in a State court

proceeding." *Williams*, 529 U.S. at 405-406.

Finally, the federal court reviews a state court's determination of **mixed questions of law

and fact** to determine whether they constitute an 'unreasonable application' of clearly

established federal law." *Lockyear v. Andrade*,     U.S.     , 123 S. Ct. 1166, 1173 (2003),

*quoting Williams, supra*. A state court's determination of mixed questions of law and fact is an

"unreasonable application" of clearly established federal law when "the state court identifies the

correct governing legal principle form [the Supreme Court's] decisions but unreasonably applies

that principle to the facts of the prisoner's case." *Id.* at 1174. Further, "[t]he state court's

application of clearly established law must be **objectively unreasonable**"; it is not enough if the

decision is merely "incorrect or erroneous." (Emphasis added) *Id.* at 1174-75.

Mr. Lindsey's petition establishes that he has exhausted his state remedies and asserts

that he is being held in violation of the Constitution. He also asserts that the determinations of

the Delaware courts, evaluated objectively and on the merits, resulted in an outcome that cannot

reasonably be justified under existing Supreme Court precedent. *Werts v. Vaughn*, 228 F.3d

178, 197 (3d Cir. 2000); *Hardcastle, supra*.

### B. The Applicable Legal Standard for Ineffective Assistance of Counsel.

A petition for a writ of habeas corpus based on the ineffectiveness of counsel is not

simply a review of whether counsel committed, or permitted the court to commit, an error.

According to the United States Supreme Court in ***Strickland v. Washington***, 466 U.S. 668 (1984), a petitioner bears the burden of proving the ineffectiveness of counsel under the Sixth Amendment to the United States Constitution, and he must show that:

(1) defense counsel's performance fell below an objective standard of reasonableness [***Id.*** at 688]; and

(2) there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. ***Id.*** at 694.

*See also* ***Williams v. Taylor***, 529 U.S. at 367, 373, 391-95. The Sixth Amendment "requires not merely the provision of counsel to the accused, but 'assistance,' which is to be 'for his defense.' Thus, 'the core purpose of the counsel guarantee was to assure assistance at trial, when the accused was confronted with both the intricacies of the law and the advocacy of the public prosecutor.'" ***United States v. Cronic***, 466 U.S. at 654, *citing* ***United States v. Ash***, 413 U.S. 300, 309 (1973). The accused is entitled to have "counsel acting in the role of an advocate." ***Id.*** at 656, *citing* ***Anders v. California***, 386 U.S. 738, 743 (1967). To prove counsel was deficient, a petitioner must demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." ***Strickland***, 466 U.S. at 687.

In the context of a guilty plea, counsel must give objectively reasonable advice before the presumption of effectiveness attaches. ***Hill v. Lockhart***, 474 U.S. 52 (1985). Ineffective assistance of counsel at the plea stage renders the plea involuntary and invalid. ***Id.*** at 56. The prejudice prong:

focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, **but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial**.

(Emphasis added) ***Id.*** at 59. *See* ***United States v. Brown***, 991 F.2d 1162, 1168 (3d Cir. 1993) (vacating sentence when it was unclear whether defendant had received effective assistance).

14

"An attorney's performance is deficient when he or she fails to conduct any investigation into exculpatory evidence and has not provided any explanation for not doing so." *Stevens*, 295 F.3d at 372; *United States v. Gray*, 878 F.2d 702 (3d Cir. 1989). Further, only after conducting a reasonable investigation can counsel make informed tactical decisions. *United States v. Barbour*, 813 F.2d 1232, 1234 (D.C. Cir. 1987); *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). Counsel has an obligation to "investigate what information . . . potential eyewitnesses possess[], even if he later decided not to put them on the stand." *Gray*, 878 F.2d at 712; *Sanders*, 21 F.3d at 1457, *citing Hoots v. Allsbrook*, 785 F.2d 1214, 1220 (4th Cir. 1986)("neglect even to interview available witnesses to a crime simply cannot be ascribed to trial strategy and tactics"). For example, in *Gray*, the Third Circuit criticized defense counsel's complete failure to conduct any investigation and held that it had resulted not from tactical considerations, but on a lack of diligence. 878 F.2d at 713.

Similarly, in *Sanders*, 21 F.3d at 1460, the court of appeals held that defense counsel had "violated his elementary obligation to inquire into both facts and law before determining what was in his client's best interest." Accordingly, counsel had denied his client the "opportunity to obtain exculpatory evidence of critical importance . . ., evidence that strongly suggested the most viable defense his client possessed – mistaken identity – and he refused to lift a finger to secure it, or even ascertain its validity." *Id.*

Further, in *Berryman v. Morton*, 100 F.3d 1089, 1096 (3d Cir. 1996), the Third Circuit agreed with the district court's holding that defense counsel's trial strategy of not impeaching a rape victim with the prior inconsistent identification of her assailant and not calling two witnesses to cast further doubt on her testimony was objectively unreasonable. Echoing the established principle that a state court's finding that defense counsel's trial strategy is entitled to a presumption of correctness, the Court held that "the question of whether counsel's strategy was

15

reasonable goes directly to the performance prong of the ***Strickland*** test, thus requiring the application of legal principles, and de novo review." ***Id.*** at 1095.

While acknowledging that "an attorney need not fully investigate every avenue if he or she has reasonable ground for not doing so," the Court that there was no reasonable ground for counsel's failure to contact two material witnesses and failure to attack the victim with her prior inconsistent statement. ***Id.*** at 1100.

### C. Mr. Lindsey Received Ineffective Legal Assistance.

In the context of these legal precepts, the inquiry here is whether defense counsel's failure to investigate exculpatory evidence and to properly use other favorable evidence constituted fundamental errors or omissions that prevented Mr. Lindsey from properly defending his case and defeating the indictment against him.

<u>First</u>, there was no eyewitness evidence, identifying Mr. Lindsey as the shooter or even placing him in the store at the time of the shooting. In fact, the only eyewitness to the shooting, Ms. Modi, did not identify him as the shooter or pick his picture from the State's photo array.

Further, there was substantial conflict in the descriptions and identifications from the witnesses to the events surrounding the incident. For example, Archie Monroe heard a shot and then saw "a black male subject exiting the store and running away." Ex. D. He described the man as "6'03", medium build, dark complexion, facial hair, last seen wearing a black or blue hat, dark sweat shirt, dark pants with a white t-shirt hanging outside of his pants." Ex. D. He did not pick Mr. Lindsey out of the photo array (containing Mr. Lindsey's picture), but he picked another man (not Mr. Lindsey) from the live lineup as the man he saw fleeing the scene after the shooting. At the same time, Mr. Everett who observed the same events picked Mr. Lindsey out of the lineup. So there was a major conflict in the State's evidence, one that counsel should have investigated and could have effectively used in the defense.

None of the other purported witnesses heard the shot, saw anyone leaving the scene or placed Mr. Lindsey in or near the store at that time. All of their observations came **before** the shooting (in some instances, it is not clear how long before the shooting), and their descriptions varied substantially from Mr. Monroe's. They all identified a man of "thin build," not "medium build", and wearing a black "flight jacket," not "a dark sweat shirt." [Exhibit D] And none of them saw a white t-shirt hanging out of that man's pants. Clearly, the person they identified (even assuming that they were describing Mr. Lindsey)[4] was not the man Mr. Monroe saw.

Strikingly, Mr. Lindsey's counsel did not contact any of these people or conduct any additional investigation to advance his defense.

**Second,** at some point after his indictment, Mr. Lindsey provided his counsel with the names of witnesses who would have placed him across the street from the store at the time of the shootings. His counsel did not contact these potentially exculpatory witnesses, and as a result, Mr. Lindsey never had the benefit of this favorable evidence in his defense.

**Third,** there was another major hole in the State's case. The police never found the gun used in the shooting and never developed any other physical, forensic or scientific evidence, such as ballistics tests, fingerprints or DNA analysis, to connect Mr. Lindsey to the shooting. But counsel never used these facts to his advantage.

**Fourth,** both counsel and the police were aware that another equally plausible suspect, Ed Rogers, had given a false alibi. If properly developed, this evidence would have completely exonerated Mr. Lindsey, especially when viewed in light of the absence of any eyewitness and scientific evidence against Mr. Lindsey and the conflicting identifications. Yet counsel did nothing to investigate or use this important exculpatory evidence.

---

[4] Only one witness, Ms. Dunn, identified Mr. Lindsey as being in the area **before** the shooting. The others, Ms. Devine, Ms. Coverdale and Mr. Hale, made similar descriptions to Ms. Dunn's, but none of them picked him out of the photo array or the lineup.

17

In addition, the State did not do much to investigate or locate Mr. Rogers. For example, it does not appear that the State included his picture in the photo array it showed to the witnesses, nor was he present in the live lineup.

Significantly, not long after the grand jury returned the original indictment against Mr. Lindsey, the police closed their investigation of Mr. Rogers. Cleary, the State had no real interest in pursuing this line of investigation. To do so would have permitted Mr. Lindsey's counsel to argue that, even the State harbored a reasonable doubt about Mr. Lindsey's guilt, because it was chasing another plausible suspect at the same time it was prosecuting Mr. Lindsey.

But Mr. Lindsey's counsel neither exploited the State's inaction, nor took its own steps to pursue Mr. Rogers as another credible suspect. They did not request that the State prepare a photo array containing Mr. Rogers' picture and show it to the witnesses, and they did not prepare one of their own to show to the witnesses.

Taken together, all of these elements – no weapon, no eyewitness, conflicting identifications, alibi witnesses, no forensics and another credible suspect whom the State did not want to investigate – in the hands of competent counsel would have provided a strong defense for Mr. Lindsey. At the very least, they were more than sufficient to establish reasonable doubt for the jury.

But Mr. Lindsey's counsel ignored these facts and did not conduct even the most basic investigation, properly analyze the evidence or adequately prepare his defense. Instead they had him examined for an organic mental disorder, transferred to a state hospital and medicated. Then they pressed him to plead guilty. At that point, he had no choice but to plead guilty.

Of equal importance is the fact that the trial court ignored Mr. Lindsey's protests. He complained at least two times directly to the court of his counsel's failures, starting as early as

18

October 2001 and again in February 2002. He also brought the matter directly to the court immediately after he entered his plea. But his protests fell on deaf ears, just as they did when he challenged them in his post-conviction petitions.

As a result, his counsel's representation fell below the minimal standard of competency and was not objectively reasonable. Further, by rejecting Mr. Lindsey's claim that his representation was constitutionally ineffective, the Delaware courts' factual and legal determinations were objectively unreasonable.

## CONCLUSION

For these reasons, Mr. Lindsey's legal counsel was constitutionally ineffective, and he is being held in violation of the Constitution of the United States. As a result, the Court should grant a writ of habeas corpus.

Respectfully submitted,

Michael J. Goodrick

Michael V. Gilberti

Dated: February 23, 2005